**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell (Bar No. 202091)
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATE DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JOSE LICEA and SONYA VALENZUELA, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

CINMAR, LLC, a Delaware limited liability company; and DOES 1 through 25, inclusive,

Defendants.

Case No. 2:22-cv-06454-MWF (JEMx)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

[Pl.'s Response to Def.'s RJN filed concurrently herewith]

Date:       February 6, 2023
Time:       10:00 a.m.
Courtroom: 5A
Judge:      Hon. Michael W. Fitzgerald

# **TABLE OF CONTENTS**

**Page(s)**

I. ARGUMENT ............................................................................................... 1

    A. Article III Standing to Sue Exists. ................................................... 1

        1. The First Amended Complaint Has Sufficiently Alleged an Injury In Fact to Plaintiffs' Dignity. ....................................... 1

        2. The FAC Has Sufficiently Alleged an Injury to Plaintiffs' Dignity That Is "Fairly Traceable" to Defendant's Conduct. ....................... 1

            a. The FAC Does Not Show that Plaintiffs' Injury Is *Solely* Their Own Fault, Which Is Necessary to Break the Causal Chain. ................................................................ 2

            b. *Mendia v. Garcia* Is Distinguishable. .................................... 8

            c. *Red v. General Mills, Inc.* Is Distinguishable. ....................... 9

            d. *Makaryan v. Volkswagen Group of America, Inc.* Is Distinguishable. ........................................................... 11

            e. *Laufer v. Looper* Is Unpersuasive. ....................................... 12

            f. *Center for Biological Diversity v. United States Environmental Protection Agency* Is Distinguishable. ......... 13

            g. *National Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales* Is Unpersuasive. ....................................... 16

    B. Subdivision (a) of Section 631 of the California Penal Code Has Four Distinct Clauses All of Which Are at Issue. ............................... 16

    C. The First Clause Is Actionable. ...................................................... 16

        1. Plaintiffs' Use of Either a Smart Phone or a Computer to Visit Defendant's Website Satisfies the "Telegraph" or "Telephone" Requirement of the First Clause. .................................. 16

        2. The First Clause Includes the Conduct of Participants to Internet Communications. ............................................. 20

a. Unlike the Federal Wiretap Act, the First Clause Provides No Direct Party Exception.............................................................20

b. The Undefined Term "Unauthorized" Within Section 631 Is Intended to Include Lack of Consent by the Consumer. ......21

c. *Rogers v. Ulrich* Is Unpersuasive. ........................................21

d. *Smith v. LoanMe, Inc.* Provides Important Guidance...........24

e. *People v. Carella* Does Not Support Defendant. .................25

D. The Second Clause Is Actionable.................................................26

1. The FAC Alleges that a Third Party Violated the Second Clause..26

2. The FAC Plausibly Alleges the "While" "In Transit or Passing Over" Requirement of the Second Clause. ...................................28

3. The Second Clause Is Not Limited to Eavesdropping Occurring Via Computer Servers Located in California. ........................................33

E. The Third and Fourth Clauses Are Actionable. ........................................34

F. NRF's Statute of Limitations Argument Is Without Merit and Flatly Contradicts Defendant's Position. ..............................................................34

G. The Term "Landline Telephone" Should Be Broadly Construed to Include Defendant's Computer Equipment. .........................................................35

H. The FAC Sufficiently Alleges the Absence of Consent to the Recording of Plaintiffs' Communications. ........................................................................36

1. The FAC Did Not Make Any Judicial Admission that Plaintiffs Consented to Defendant's Wrongful Conduct. .............................37

2. Defendant's Reliance on *NEI* Is Misplaced. ...................................37

3. NRF's Reliance on Extrinsic Evidence Is Improper. .....................38

I. The Court Should Disregard Defendant's Smear Attack. .........................38

II. CONCLUSION..................................................................................................39

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Adler v. Community.com, Inc.*,
   2021 WL 4805435 (C.D. Cal. Aug. 2, 2021) (Blumenfeld, J.) ...................28, 29

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ..........................................................................................18

*Backer ex rel. Freedman v. Shah*,
   788 F.3d 341 (2d Cir. 2015) ........................................................................2, 3, 8

*Bagdasaryan v. City of Los Angeles*,
   2020 WL 2770689 (C.D. Cal. Mar. 24, 2020) (Staton, J.) ...............................34

*Barker v. Riverside County Office of Education*,
   584 F.3d 821 (9th Cir. 2009) ...........................................................................35

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................................35

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
   2016 WL 3543699 (S.D. Cal. June 29, 2016) .....................................................1

*Brodsky v. Apple Inc.*,
   445 F. Supp. 3d 110 (N.D. Cal. 2020) ..............................................................35

*Bruno v. Quten Research Inst., LLC*,
   280 F.R.D. 524 (C.D. Cal. 2011) (Carter, J.)....................................................38

*Campbell v. Facebook Inc.*,
   77 F. Supp. 3d 836 (N.D. Cal. 2014) ..........................................................28, 36

*Carrese v. Yes Online Inc.*,
   2016 WL 6069198 (C.D. Cal. Oct. 13, 2016) (Otero, J.) ....................................1

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) (Posner, J.) .......................................................6, 7

*Center for Biological Diversity v. United States Environmental Protection
   Agency*,
   937 F.3d 533 (5th Cir. 2019) ............................................................. 13, 15, 16

*Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*,
   754 F. Supp. 1336 (N.D. Ill. 1991) ....................................................................3

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983).............................................................................................15

*Civil Rights Educ. and Enforcement Center v. Hospitality Props. Trust*,
   867 F.3d 1093 (9th Cir. 2017) ................................................................ *passim*

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)................... 4, 13, 14, 15

*Colorado Cross-Disability Coalition v. Abercrombie & Fitch Co.*,
   765 F.3d 1205 (10th Cir. 2014) .......................................................................12

*D'Lil v. Best Western Encina Lodge & Suites*,
   538 F.3d 1031 (9th Cir. 2008) ...........................................................................5

*Davidson v. Kimberly–Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) ...........................................................................14

*Evers v. Dwyer*,
   358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) (per curiam).........................4

*Federal Election Comm'n v. Cruz*,
   142 S. Ct. 1638 (2022) ............................................................................ *passim*

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs.*,
   528 U.S. 167 (2000) (Ginsburg, J.)................................................................8, 14

*Garcia v. Hanjin International Corp.*,
   2021 WL 4260408 (C.D. Cal. June 16, 2021) (Gutierrez, J.)............................38

*Gerritsen v. Warner Bros. Enter. Inc.*,
   112 F. Supp. 3d 1011 (C.D. Cal. 2015) (Morrow, J.).......................................38

*Gordon v. Virtumundo, Inc.*,
   575 F.3d 1040 (9th Cir. 2009) ...........................................................................7

*Graham v. Noom, Inc.*,
   533 F. Supp. 3d 823 (N.D. Cal. 2021)..............................................................27

*Hammerling v. Google, Inc.*,
   - F. Supp. 3d -, 2022 WL 2812188 (N.D. Cal. July 18, 2022) .........................33

*Hammerling v. Google, Inc.*,
2022 WL 17365255 (N.D. Cal. Dec. 1, 2022), *appeal docketed*, No. 22-
17024 (9th Cir. Dec. 30, 2022) ............................................................................. 33

*Harty v. Simon Prop. Group, L.P.*,
428 Fed. Appx. 69 (2d Cir. 2011) ......................................................................... 15

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ................................................................................... *passim*

*Holloway v. Full Spectrum Lending*,
Case No. CV 06-5975 DOC, 2007 WL 7698843 (C.D. Cal. June 26,
2007) (Carter, J.) ........................................................................................................ 7

*Houston v. Marod Supermarkets, Inc.*,
733 F.3d 1323 (11th Cir. 2013) ............................................................................... 6

*In re Facebook Internet Tracking Litig.*,
140 F. Supp. 3d 922 (N.D. Cal. 2015), *aff'd in part and rev'd in part on
other grounds*, 956 F.3d 589 (9th Cir. 2020) ...................................................... 18

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021) ................. 29

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ................................................................. 26

*In re Google Inc. Gmail Litig.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......................................... *passim*

*In re Vizio, Inc.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) (Staton, J.) ............................... 29, 30, 32

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) ........................................................ 26

*Kyles v. J.K. Guardian Sec. Servs., Inc.*,
222 F.3d 289 (7th Cir. 2000) .................................................................................... 3

*Laufer v. Acheson Hotels, LLC*,
50 F.4th 259, 268-70, 272-75 (1st Cir. 2022), *petition for cert. filed*,
No. 22-429 (U.S. Nov. 8, 2022) ...................................................................... 6, 12

*Laufer v. Arpan LLC*,
   29 F.4th 1268 (11th Cir. 2022) (Jordan, J., concurring)................................6, 13

*Laufer v. Looper*,
   22 F.4th 871 (10th Cir. 2022) ......................................................................12, 13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...............................................................................................2

*Makaryan v. Volkswagen Group of America, Inc.*,
   2017 WL 6888254 (C.D. Cal. Oct. 13, 2017) (Anderson, J.)......................11, 12

*Mastel v. Miniclip*,
   549 F. Supp. 3d 1129 (E.D. Cal. 2021) ..............................................................29

*Matera v. Google Inc.*,
   2016 WL 200619 (N.D. Cal. Aug. 12, 2016) .....................................................26

*Matera v. Google Inc.*,
   2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) .....................................................1

*Mendia v. Garcia*,
   768 F.3d 1009 (9th Cir. 2014) ......................................................... 8, 9, 14, 15

*Mireskandari v. Mail*,
   2013 WL 12129559 (C.D. Cal. July 30, 2013) (Morrow, J.) .............................33

*Molski v. Evergreen Dynasty Corp.*,
   500 F.3d 1047 (9th Cir. 2007) ..............................................................................5

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ................................................................................5

*Murray v. GMAC Mortgage Corp.*,
   434 F.3d 948 (7th Cir. 2006) .......................................................................3, 6, 7

*National Family Planning and Reproductive Health Ass'n, Inc. v.*
   *Gonzales*,
   468 F.3d 826 (D.C. Cir. 2006) ...........................................................................16

*NEI Contracting and Engineering, Inc. v. Hanson Aggregates Pacific*
   *Southwest, Inc.*,
   2016 WL 4886933 (S.D. Cal. Sept. 15, 2016)...............................................36, 37

*NovelPoster v. Javitch Canfield Group*,
  140 F. Supp. 3d 938 (N.D. Cal. 2014) ........................................................29, 30

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998).......................................................................................24

*Osgood v. Main Street Marketing, LLC*,
  2017 WL 131829 (S.D. Cal. Jan. 13, 2017) .........................................................1

*Pennsylvania v. New Jersey*,
  426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam)......................4

*Petro-Chem Processing, Inc. v. E.P.A.*,
  866 F.2d 433 (D.C. Cir. 1989) (Ginsburg, J.).................................................2, 16

*PGA Tour v. Martin*,
  532 U.S. 661 (2001).......................................................................................5

*Popa v. Harriet Carter Gifts, Inc.*,
  45 F.4th 687 (3d Cir. 2022) ..........................................................................20

*Portillo v. ICON Health & Fitness, Inc.*,
  2019 WL 6840759 (C.D. Cal. Dec. 16, 2019) (Wright, J.) ...............................38

*Raffin v. Medicredit, Inc.*,
  2016 WL 7743504 (C.D. Cal. Dec. 19, 2016) (King, J.)......................................1

*Red v. General Mills, Inc.*,
  2015 WL 9484398 (C.D. Cal. Dec. 29, 2015) (Wright, J.) .....................9, 10, 11

*Revitch v. New Moosejaw, LLC*,
  2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ......................................... *passim*

*Rodriguez v. Google LLC*,
  2021 WL 6621070 (N.D. Cal. Aug. 18, 2021) ...................................................29

*Rodriguez v. Google LLC*,
  2022 WL 214552 (N.D. Cal. Jan. 25, 2022).......................................................32

*Romero v. Securus Techs., Inc.*,
  216 F. Supp. 3d 1078 (S.D. Cal. 2016)...............................................................1

*Rosenow v. Facebook, Inc.*,
  2020 WL 1984062 (S.D. Cal. Apr. 27, 2020)......................................................31

*Saleh v. Nike, Inc.*,
    562 F. Supp. 3d 503 (C.D. Cal. 2021) (Aenlle-Rocha, J.) ......................... *passim*

*Semeran v. Blackberry Corp.*,
    2016 WL 3647966 (D.N.J. July 6, 2016) ............................................................17

*Shaver v. Independent Stave Co.*,
    350 F.3d 716 (8th Cir. 2003) ..........................................................................7, 8

*Spokeo Inc. v. Robins*,
    578 U.S. 330 (2016) ...............................................................................................1

*Sunbelt Rentals, Inc. v. Victor*,
    43 F. Supp. 3d 1026 (N.D. Cal. 2014) ........................................................30, 31

*Telephone Science Corp. v. Asset Recovery Solutions, LLC*,
    2016 WL 4179150 (N.D. Ill. Aug. 8, 2016) ........................................................2

*Tourgeman v. Collins Financial Servs., Inc.*,
    755 F.3d 1109 (9th Cir. 2014) ....................................................................1, 2, 5

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ........................................................................................12

*United States v. Steiger*,
    318 F.3d 1039 (11th Cir. 2003) ..........................................................................30

*Williams v. What If Holdings, LLC*,
    2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) ..................................................27

*Yoon v. Lululemon USA, Inc.*,
    549 F. Supp. 3d 1073 (C.D. Cal. 2021) (Holcomb, J.) .............................. *passim*

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018) ..............................................................................13

**California Cases**

*Apple v. Superior Court*,
    56 Cal. 4th 128, 292 P.3d 883 (2013) ..........................................................18, 19

*Davis v. Pacific Telephone & Telegraph Co.*,
    127 Cal. 312 (1899) ........................................................................................18, 19

*Friddle v. Epstein*,
16 Cal. App. 4th 1649 (1993) ............................................................................8

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ....................................................................................10

*Ion Equip. Corp. v. Nelson*,
110 Cal. App. 3d 868 (1980) ..........................................................................35

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) ......................................................................................23

*Negro v. Superior Court*,
230 Cal. App. 4th 879 (2014) ........................................................................37

*Nolan v. City of Anaheim*,
33 Cal. 4th 335 (2004) ....................................................................................24

*People v. Carella*,
191 Cal. App. 2d 115 (1961) ...................................................................25, 26

*People v. Conklin*,
12 Cal. 3d 259 (1974) ....................................................................................20

*People v. Jones*,
30 Cal. App. 3d 852 (1973) .....................................................................21, 23

*People v. Superior Court*,
13 Cal. App. 3d 545 (1970) ...........................................................................21

*People v. Trieber*,
28 Cal. 2d 657 (1946) ..............................................................................21, 23

*People v. Wilson*,
17 Cal. App. 3d 598 (1971) .....................................................................31, 32

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) ..............................................................................23, 24

*Rogers v. Ulrich*,
52 Cal. App. 3d 894 (1975) ..........................................................21, 22, 23, 24

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021) ..................................................................23, 24, 25

**U.S. Constitution**

First Amendment................................................................3

Article III.............................................................. *passim*

**Federal Statutes**

15 U.S.C.
    § 1681b(c)(1)(B)(i) ......................................................3
    § 1681m(d)(1)(D)........................................................3
    Fair Credit Reporting Act .........................................1, 3

18 U.S.C.
    § 2510 *et seq.* ...........................................................20
    § 2511(2)(d) ............................................................20
    Federal Wiretap Act .............................................20, 30

42 U.S.C.
    § 12181 *et seq.* ..........................................................3
    § 12182(a) ................................................................5
    § 12188(a)(1)..............................................................5

    Americans with Disabilities Act ........................ 5, 6, 12, 15

    Title I of the ADA........................................................7

    Title III of the ADA .................................. 3, 5, 6, 12

    Title VII of the Civil Rights Act of 1964........................3

    Fair Housing Act
    § 804(a) ....................................................................6

    § 804(d) ....................................................................6

**California Statutes**

Business & Proffessions Code
    § 17200 *et seq.* .......................................................10

    UCL........................................................................10

Code of Civil Procedure

§ 340(a) ...................................................................................35

Penal Code

§ 630 *et seq.* ............................................................................1

§ 630............................................................................ 22, 23, 24

§ 631 ................................................................................. *passim*

§ 631(a) ............................................................................ *passim*

§ 632 ...........................................................................................23

§ 632.5(a) .................................................................................25

§ 632.6(a) .................................................................................25

§ 632.7 ............................................................................. *passim*

§ 632.7(a) ........................................................... 24, 25, 35, 36

§ 632.7(c)(1) ...........................................................................17

§ 632.7(c)(3) ...........................................................................36

§ 637.2(a)(1) .........................................................................8, 10

§ 637.2(c) ..............................................................................10, 11

§ 640..........................................................................................21, 25

California Invasion of Privacy Act ............................... *passim*

Penal Code Part 1 Title 15 Chapter 1.5 ..........................23

**Federal Rules**

Federal Rules of Civil Procedure

Rule 8(a) ...................................................................................35

Rule 9 .......................................................................................35

Rule 12(b)(6)........................................................................35, 38

**Other Authorities**

13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Fed.
Prac. & Proc. Juris. (3d ed. Apr. 2022 Update) .................. 2, 3, 8, 16

§ 3531.5..................................................................................2

n.61 ..........................................................................................3

n.70 ...................................................................................2, 3, 8

n.73 ..........................................................................................2

https://www.britannica.com/technology/Internet/Society-and-the-Internet
(last visited Jan. 17, 2023) ...................................................36

https://www.techtarget.com/searchmobilecomputing/definition/texting
(last visited Jan. 17, 2023) ...................................................36

Oxford English Online Dictionary, 2016, http://www.oed.com/ (last visited June 16, 2016) .................................................................................................17

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## I.     ARGUMENT

3

**A.     Article III Standing to Sue Exists.**

4

### 1.     The First Amended Complaint Has Sufficiently Alleged an Injury In

5

### Fact to Plaintiffs' Dignity.

6     Although Defendant's Motion doesn't challenge the First Amended Complaint

7   ("FAC") for lack constitutional standing to sue under Article III of the U.S. Constitution,

8   *amicus curiae*, the National Retail Federation ("NRF"), raises such issue in its *amicus*

9   *curiae* brief ("NRF's Amicus Brief").   (Doc. 42 at 2:19-4:20; Page ID #1803-#1805.)

10  Multiple district courts within the Ninth Circuit have held that Article III standing to sue

11  exists to pursue claims under the California Invasion of Privacy Act ("CIPA"), Cal. Civ.

12  Code § 630 *et seq.*, which means that such claims satisfy Article III's "concrete injury"

13  requirement.[1] "[A]llegations of violations of Plaintiffs' statutory rights under CIPA,

14  without more, constitute injury in fact because instead of a bare technical violation of a

15  statute, as was the case under the FCRA considered in *Spokeo*[*, Inc. v. Robins*, 578 U.S.

16  330 (2016)], a CIPA violation 'involves much greater concrete and particularized harm

17  ... a violation of privacy rights', and therefore, a violation of CIPA is a 'violation of a

18  procedural right granted by statute ... sufficient ... to constitute injury in fact.'"  *Osgood*,

19  2017 WL 131829, at *7.

20

### 2.     The FAC Has Sufficiently Alleged an Injury to Plaintiffs' Dignity That

21

### Is "Fairly Traceable" to Defendant's Conduct.

22     As the Ninth Circuit has explained, "[w]hen the injury in fact is the violation of a

23  statutory right that we inferred from the existence of a private cause of action, causation

24

---

25  [1] *See, e.g.*, *Raffin v. Medicredit, Inc.*, 2016 WL 7743504, at *2-*3 (C.D. Cal. Dec. 19, 2016) (King, J.); *Carrese v. Yes Online Inc.*, 2016 WL 6069198, at *5-*6 (C.D. Cal. Oct.

26  13, 2016) (Otero, J.); *Matera v. Google Inc.*, 2016 WL 5339806, at *14 (N.D. Cal. Sept. 23, 2016); *Osgood v. Main Streat Marketing, LLC*, 2017 WL 131829, at *7-*8 (S.D. Cal.

27  Jan. 13, 2017); *Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1087-89 (S.D. Cal. 2016); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 2016 WL 3543699, at *7-*8

28  (S.D. Cal. June 29, 2016); *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *17 (N.D. Cal. Sept. 26, 2013).

and redressability'—the two other elements of standing—'will usually be satisfied.'"
*Tourgeman v. Collins Financial Servs., Inc.*, 755 F.3d 1109, 1116 (9th Cir. 2014) (citation omitted).

### a.   The FAC Does Not Show that Plaintiffs' Injury Is *Solely* Their Own Fault, Which Is Necessary to Break the Causal Chain.

NRF challenges the causal connection between Plaintiffs' injury to their dignity and Defendant's alleged wrongdoing by arguing that Plaintiffs suffered a self-inflicted injury.  (NRF's Amicus Br. at 3:15-4:18.)  NRF's cramped analysis is without merit.

"[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).

As a well-recognized treatise on federal practice has explained, "Self-inflicted injury may seem a suspicious basis for standing.  It is clear, however, that no rigid lines are drawn on this basis."  13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3531.5 (3d ed. Apr. 2022 Update) ("Wright, Miller & Cooper").  That same treatise further explained, "Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury."  Wright, Miller & Cooper, *supra*, § 3531.5 & n.70.  "A self-inflicted injury defeats standing only if the injury is ***so completely due to the plaintiff's fault as to break the causal chain***."  *Id.* at n.70 (emphasis added) (citing *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015) (quoting Wright, Miller & Cooper); Wright, Miller & Cooper, *supra*, § 3531.5 & n.73 ("Standing is defeated only if it is concluded that the injury is ***so completely due to the plaintiff's own fault as to break the causal chain***.") (emphasis added); *Telephone Science Corp. v. Asset Recovery Solutions, LLC*, 2016 WL 4179150, at *6 (N.D. Ill. Aug. 8, 2016) (citing *Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989) (Ginsburg, J.) and Wright, Miller & Cooper, *supra*).

"It is enough for standing that *the defendants' conduct may have contributed to causing the injury*."[2]  Wright, Miller & Cooper, *supra*, at n.70 (emphasis added) (citing *Backer*, 788 F.3d at 344).

Notably, the aforementioned treatise cited in support as illustrative the U.S. Supreme Court's landmark decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982).[3]  Wright, Miller & Cooper, *supra*, § 3531.5 & n.61.  *Havens* held, "That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of [the statute prohibiting unlawful misrepresentations]." *Id.* at 374.

*Havens* continues to be recognized as supporting tester standing even by the U.S. Supreme Court itself.  *See Federal Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647 (2022) (citing *Havens*).   In *Cruz*, the Supreme Court squarely addressed the Government's challenge to Senator Ted Cruz's standing to sue asserting a First Amendment constitutional claim to a federal statute restricting post-election funds and thereby allegedly burdening political speech.  Although the Government argued that Senator Cruz and other plaintiffs lacked "standing because their injuries were 'self-inflicted,'" *id.* at 1647, and asked the Supreme Court "to recognize an exception to

---

[2] "Plaintiffs do not ordinarily have an obligation to change their behavior in order to escape injury from the unlawful acts of defendants . . . ." *Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*, 754 F. Supp. 1336, 1353 (N.D. Ill. 1991) ("Logically, the NBA's argument has holes. If I swing my fist at your face, you may decide to duck. But if you stand still, and I deck you, I am the cause of your injury. You did not punch yourself.").

[3] There is nothing to indicate that *Havens Realty Corp.* should be interpreted as limited to "housing discrimination" only.  (NRF's Amicus Br. at 4:8.)  Testers also have been recognized in employment discrimination cases.  *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 300 (7th Cir. 2000) (holding that employment "testers" have standing to sue under Title VII of the Civil Rights Act of 1964); *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) (referring to "testers" "in housing *and employment litigation*") (emphasis added).  In addition, federal courts, including the Ninth Circuit, have long recognized that testers can establish Article III standing in cases alleging violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181 *et seq*. *Civil Rights Educ. and Enforcement Center v. Hospitality Props. Trust*, 867 F.3d 1093, 1096, 1101-02 (9th Cir. 2017).  Furthermore, *Murray* was a *consumer protection* action brought under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681b(c)(1)(B)(i), 1681m(d)(1)(D).  *Murray*, 434 F.3d at 950.

traceability for injuries that a party purposely incurs," *id.*, the Supreme Court rejected such challenge. *Id.* at 1647-50. The Supreme Court explained its reasoning in relevant part as follows:

> "We have never recognized a rule of this kind under Article III. To the contrary, ***we have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred***. See *Evers v. Dwyer*, 358 U.S. 202, 204, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) (per curiam) (that the plaintiff subjected himself to discrimination "for the purpose of instituting th[e] litigation" did not defeat his standing); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (a "tester" plaintiff posing as a renter for purposes of housing-discrimination litigation still suffered an injury under Article III).
>
> The cases the Government cites do not alter our conclusion. In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), for example, the plaintiffs attempted to manufacture standing by voluntarily taking costly and burdensome measures that they said were necessary to protect the confidentiality of their communications in light of the Government surveillance policy they sought to challenge. *Id.*, at 402, 133 S.Ct. 1138. Their problem, however, was that they could not show that they had been or were likely to be subjected to that policy in any event. *Id.*, at 416, 133 S.Ct. 1138. Likewise, in *Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam), we held that the unilateral decisions by a group of States to reimburse their residents for taxes levied by other States was not a basis to attack the legality of those taxes. Nothing in the challenged taxes required the plaintiff States to offer reimbursements; accordingly, the financial injury those States suffered was due to their own independent response to taxes levied on others. *Id.*, at 664, 96 S.Ct. 2333. Here, by contrast, the appellees' injuries are directly inflicted by the FEC's

threatened enforcement of the provisions they now challenge. That appellees chose to subject themselves to those provisions does not change the fact that they *are* subject to them, and will face genuine legal penalties if they do not comply." *Cruz*, 142 S. Ct. at 1647 (first emphasis added; second emphasis in original).  Notably, NRF's Amicus Brief omits addressing *Cruz*, which speaks volumes.

In *Civil Rights Educ. and Enforcement Center v. Hospitality Props. Trust*, 867 F.3d 1093, 1101-02 (9th Cir. 2017) ("*CREEC*"), the Ninth Circuit expressly cited *Havens Realty Corp.* in support of its Article III standing analysis in a case involving allegations of violations of Title III of the ADA.  867 F.3d at 1101-02.  Notably, the Ninth Circuit held that "a plaintiff has constitutional standing" even if "her only motivation for visiting a facility is to test it for ADA compliance".  *Id.* at 1096; *id.* at 1102 ("We . . . conclude that motivation is irrelevant to the question of standing under Title III of the ADA.  The Named Plaintiffs' status as ADA testers thus does not deprive them of standing."); *id.* at 1101-02 (noting that 42 U.S.C. § 12182(a) states that "*[n]o individual* shall be discriminated against on the basis of disability" and noting that Title III provides remedies for "any person" subjected to illegal disability discrimination as stated in 42 U.S.C. § 12188(a)(1)) (emphasis in original); *see also D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) ("For the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA.") (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 733 (9th Cir. 2007) ("One need not be a client or customer of a public accommodation to feel the sting of its discrimination.") ("Title III's broad general rule contains no express 'clients or customers' limitation . . . .") (quoting *PGA Tour v. Martin*, 532 U.S. 661, 679 (2001)).

Notably, the Ninth Circuit also cited *Havens* with approval in *Tourgeman*, 755 F.3d at 1115-16.

The Ninth Circuit is not alone in citing *Havens* favorably for its Article III standing analysis. *See, e.g.*, *Laufer v. Acheson Hotels, LLC*, 50 F.4th 259, 268-70, 272-75 (1st Cir. 2022) (citing *Havens* and *Cruz*), *petition for cert. filed*, No. 22-429 (U.S. Nov. 8, 2022); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1330–40 (11th Cir. 2013) (finding the plaintiff's tester motive behind his visit to supermarket did not foreclose standing for his claim under Title III of the ADA); *id.* at 1331 (citing *Havens* in support of the proposition that Congress omitted a requirement that there be a "bona fide offer" to rent or purchase insofar as it banned discriminatory representations in § 804(d) of the Fair Housing Act in contrast to § 804(a)); *id.* at 1332 ("The substantive right conferred by [the ADA] statute is to be free from disability discrimination in the enjoyment of the facility, regardless of [plaintiff's] motive for visiting the facility."); *id.* ("Nothing in that statutory language precludes standing for tester plaintiffs; if anything, 'no individual' and 'any person' are broad terms that necessarily encompass testers."); *id.* at 1333 ("Congress has in other anti-discrimination statutes required that a plaintiff have 'bona fide' –as opposed to tester-status"); *id.* at 1333-34 ("Congress has said so expressly when it wants to limit the class of people protected by anti-discrimination statutes to only clients or customers or to people of bona fide status.  But Congress expressed no such limitation in the parts of Title III that are relevant to Plaintiff['s] lawsuit."); *see also Laufer v. Arpan LLC*, 29 F.4th 1268, 1277-82 (11th Cir. 2022) (Jordan, J., concurring) ("*Havens Realty* is still on the books, and we are bound to apply it here.").

In *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), the Seventh Circuit, citing *Havens*, held that "testers" "usually are praised rather than vilified," *id.* at 954, noted that the district judge had failed to "cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders," *id.*, and stated, "Repeat litigants may be better able to monitor the conduct of counsel, who as a practical matter are the class's real champions." *Id.*  In *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011) (Posner, J.), the Seventh Circuit, citing *Murray*, stated that "it's not unlawful to be a

professional class action plaintiff". *Id.* at 724 (citing *Murray*); *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1056 (9th Cir. 2009) ("[T]he term 'professional,' as in 'professional plaintiff,' is not a 'dirty word,' . . . and should not itself undermine one's ability to seek redress for injuries suffered . . . .") (citing *Murray*); *Holloway v. Full Spectrum Lending*, Case No. CV 06-5975 DOC (RNBx), 2007 WL 7698843, at *8 (C.D. Cal. June 26, 2007) (Carter, J.) ("Next, [defendant] argues that [plaintiff] is a "professional plaintiff" who is closely tied to her lawyers. ***The Court agrees with the Seventh Circuit that nothing in the [federal statute at issue] precludes a plaintiff from suing multiple parties that have violated her rights.***") (emphasis added) (citing *Murray*).

In *Shaver v. Independent Stave Co.*, 350 F.3d 716 (8th Cir. 2003), the Eighth Circuit reversed the district court's granting of summary judgment against a terminated employee who had sued his former employer for retaliation under Title I of the ADA. Although the district court had concluded that the plaintiff had attempted to manufacture a retaliation claim against her former employer, *id.* at 723, the Eighth Circuit rejected the district court's view that "manufactured" claims are not actionable. *Id.* The Eighth Circuit noted, "The district court seems to have added an additional requirement [to state a prima facie case], namely, that the party asserting the claim did not purposefully seek the adverse action. Nothing in the words of the statute or in our cases, however, suggests that the conduct of the aggrieved party, other than the party's initial protected activity, is relevant." *Id.* at 724. Significantly, the Eighth Circuit expressly cited "tester" cases including *Havens* in which "claims were created solely for the purpose of litigation." *Id. Shaver* noted that two different reasons allowed such suits to proceed. First, it cited a "dignitary interest" that discrimination statutes are designed to protect regardless of any economic harm to the plaintiffs. *Id.* Second, "tester cases have been allowed to proceed on a 'private attorney general' theory." *Id.* "By giving litigants an incentive to attack illegal activity . . . , Congress enlisted private self-interest in the enforcement of public policy." *Id.* at 724-25. The Eighth Circuit held, "[W]e disagree with the district court's

holding that a 'manufactured' claim that meets the statutory requirements cannot proceed." *Id.* at 725.

*Shaver* is directly on point. As was the case in *Shaver*, Plaintiffs' dignitary interest is intended to be protected by the statutes at issue here, namely, CIPA. *Friddle v. Epstein*, 16 Cal. App. 4th 1649, 1660-61 (1993) ("***Any invasion of privacy involves an affront to human dignity***") (emphasis added).

In addition, the California Legislature "enlisted private self-interest in the enforcement of public policy" "[b]y giving litigants an incentive to attack illegal activity," *Shaver*, 350 F.3d at 724-25, via the minimum statutory damages remedy of $5,000. Cal. Penal Code § 637.2(a)(1). Indeed, the U.S. Supreme Court has "recognized on numerous occasions that 'all civil penalties have some deterrent effect.'" *Friends of the Earth, Inc. v. Laidlaw Environmental Servs.*, 528 U.S. 167, 185 (2000) (Ginsburg, J.); *id.* at 185-86 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. ***Civil penalties can fit that description***. To the extent that they encourage defendants to discontinue current violations and ***deter*** them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.") (emphasis added).

Here, the injury to Plaintiffs' dignity was "not solely attributable to" "[P]laintiff's actions." Wright, Miller & Cooper, *supra*, at n.70 (citing *Backer*, 788 F.3d at 344). Rather, the FAC makes it clear that Defendant's unlawful conduct contributed to causing the injuries either solely or almost entirely on its own. Thus, NRF's causation analysis is without merit.

### b. *Mendia v. Garcia* Is Distinguishable.

NRF's reliance on *Mendia v. Garcia*, 768 F.3d 1009, 1013 n.1 (9th Cir. 2014), (NRF's Amicus Brief at 3:28-4:1; 4:9), is misplaced because it should be narrowly construed as limited to the unique facts at issue therein, *i.e.*, a pretrial detainee who

deliberately chose to stay in state custody (jail) despite the fact that the state court granted the plaintiff release on his own recognizance purportedly because the plaintiff allegedly feared that if he left state custody, ICE would seize and deport him (despite his status as a U.S. citizen).  In essence, the Ninth Circuit implicitly found that the plaintiff alleged a "self-inflicted injury" because his alleged fear of "future harm" could not be deemed fairly traceable to the actions of the ICE agents who allegedly lodged an immigration detainer against the plaintiff (precluding him from securing his pre-trial release via bail).  Significantly, the Ninth Circuit found that the plaintiff's alleged fear about being seized and deported by ICE upon his release from state custody was "entirely speculative." *Mendia*, 768 F.3d at 1013 n.1.  Thus, the Ninth Circuit, in essence, held that it was entirely unreasonable for the plaintiff therein to remain in jail despite the state court granting him release on his own recognizance.  That is a far cry from the facts alleged in the FAC filed in the instant action.  That is, the FAC does not allege any facts from which to infer that it would be entirely unreasonable for Plaintiffs to expect Defendant to violate sections 631(a) and 632.7 of the California Penal Code in the future especially given that Defendant vigorously denies ever having violated such statutes in the past.

Moreover, what if the plaintiff in *Mendia* had established a non-speculative fear about being deported by ICE in the future (based on evidence showing personal animosity towards him by high-ranking ICE officials)?  If the plaintiff had functioned as a litigation tester, would that affect the outcome of that hypothetical fact pattern with respect to the issue of Article III standing?  Simply put, there is nothing in *Mendia* suggesting that the plaintiff therein would lack constitutional standing under those circumstances if such plaintiff had established a non-speculative fear about being deported by ICE in the future.

Further, the Ninth Circuit in *Mendia* had no occasion to reconcile its opinion with *Havens*, and it was decided before *Cruz*.

Finally, NRF has failed to make any attempt to reconcile *Mendia* with *CREEC*.

      **c.**    ***Red v. General Mills, Inc.* Is Distinguishable.**

NRF's reliance on *Red v. General Mills, Inc.*, 2015 WL 9484398 (C.D. Cal. Dec. 29, 2015) (Wright, J.), (NRF's Amicus Br. at 3:22-28), is misplaced as it is distinguishable. *Red* involved a fact pattern in which the individual plaintiff alleged false advertising in violation of the "unfair" and "unlawful" prongs of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. *Red*, 2015 WL 9484398, at *1. Although the operative pleading in *Red* did not expressly allege the violation of the "fraud" prong of the UCL, the Court surely treated the allegations at issue therein as invoking that prong of the UCL, which is important because it triggered an actual reliance requirement as part of the UCL's statutory standing requirements. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009) ("We conclude that a class representative proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate ***actual reliance*** on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions.") (emphasis added). Thus, the Court in *Red*, in essence, found that the pleading at issue therein failed to sufficiently allege the required element of actual reliance in light of the litigation history of the plaintiff, which the Court took judicial notice of. *Red*, 2015 WL 9484398, at *3 (taking judicial notice of the fact that the plaintiff therein was the named plaintiff in three other "substantially similar" putative class action complaints alleging "false advertising claims relating to various misrepresentations on the product's ingredient label relating to the trans-fat content of the product and the health effects of consuming the product").

Here, in contrast, Plaintiffs have not asserted any UCL claim for relief at all, and there is no actual reliance element under either section 631(a) of the Penal Code nor section 632.7 of the Penal Code. Indeed, the broad scope of CIPA is demonstrated by the fact that the California statute that authorizes minimum statutory damages of $5,000 for CIPA violations, (Cal. Penal Code § 637.2(a)(1)), states in subdivision (c) of section 637.2 as follows, "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, ***actual damages***." (Cal. Penal Code

§ 637.2(c)) (emphasis added).  Thus, the California Legislature intended to deter any CIPA violations by omitting an actual damages requirement for CIPA violations.

In addition, the Court in *Red* failed to make any attempt to reconcile its decision about "self-inflicted injury" with the U.S. Supreme Court's decision in *Havens*.  And, *Red* was decided before *CREEC* or *Cruz* were decided.  Thus, to the extent that *Red* is inconsistent with either *Cruz*, *Havens*, or *CREEC* in addressing constitutional standing under Article III of the U.S. Constitution, *Red* should not be followed here.

### d. *Makaryan v. Volkswagen Group of America, Inc.* Is Distinguishable.

NRF's reliance on *Makaryan v. Volkswagen Group of America, Inc.*, 2017 WL 6888254 (C.D. Cal. Oct. 13, 2017) (Anderson, J.), (NRF's Amicus Br. at 4:1-3), is misplaced.  *Makaryan* involved a fact pattern in which the plaintiff alleged that the Start/Stop System on the plaintiff's Audi A3 automobile operated defectively because the vehicle's engine will not restart if, during a stop, the driver's seat belt is removed.  *Id.* at *1.  Not only did the Court find a failure to allege a sufficient injury in fact, *id.* at *5-*6, the Court also found that the complaint failed to sufficiently allege causation for Article III standing purposes.  *Id.* at *6-*7.  Notably, the Court held that "the alleged defect upon which Plaintiff's claims are based is only revealed when she takes a specific action that is disavowed by the manufacturer . . . (directing drivers to wear seat belts) . . . and generally is illegal[.]"  *Id.* at *7.  The Court held that "[t]he Unintended Rolling is most directly caused by Plaintiff's own action."  *Id.*  The Court added, "But even if there are circumstances in which a driver may desire to unfasten her seat belt without placing the vehicle in park, the fact remains that such use of the vehicle is contrary to the manufacturer's recommendation."  *Id.*  In other words, the plaintiff's misuse of the automobile product by driving it with the driver's seat belt removed was deemed to have solely broken the causal chain connecting the defendant's alleged conduct to the plaintiff's injury in fact, which, as mentioned above, was deemed to be insufficient as a matter of law.

Here, in contrast, Plaintiffs' use of Defendant's chat feature was not disavowed by Defendant as somehow improper or illegal. Thus, *Makaryan* is akin to comparing apples to oranges.

### e. *Laufer v. Looper* **Is Unpersuasive.**

NRF's reliance on the Tenth Circuit's decision in *Laufer v. Looper*, 22 F.4th 871, 879 (10th Cir. 2022), (NRF's Amicus Br. at 4:9-11), is misplaced. Although *Laufer* noted that the plaintiff's "status as a tester alone is insufficient to confer standing," 22 F.4th at 879, NRF conveniently omits to mention that *Laufer* also held that "[the plaintiff's] status as a tester ***does not defeat standing***." *Id.* at 883 (emphasis added). Indeed, *Laufer* reiterated that "***testers may have standing under the ADA regardless of their motivations for encountering a violation***." *Id.* (emphasis added). In so doing, *Laufer* expressly cited and echoed the Tenth Circuit's decision in *Colorado Cross-Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205 (10th Cir. 2014), the latter of which held that "anyone who has suffered an invasion of the legal interest protected by Title III [of the ADA] ***may have standing, regardless of his or her motivation in encountering the invasion***." *Id.* at 1211 (emphasis added), *quoted in Laufer*, 22 F.4th at 882. Notably, *Laufer* did not purport to overrule its prior decision in *Colorado Cross-Disability Coalition*.

In addition, although *Laufer* cited the "downstream consequences" remark in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021), *see Laufer*, 22 F.4th at 881, the First Circuit has characterized *TransUnion LLC*'s reference to "downstream consequences" as "certainly look[ing] like dictum given that the Court concluded the plaintiffs didn't allege they hadn't received any required information." *Acheson Hotels, LLC*, 50 F.4th at 271 n.4.

Indeed, given that the Supreme Court decided *Cruz* after *TransUnion LLC*, and expressly cited *Havens Realty* in doing so, *Cruz*'s holding strongly suggests that *Havens Realty* remains binding on lower federal courts despite *TransUnion LLC*.

Furthermore, *Laufer* "failed to meaningfully distinguish *Havens Realty*." *Arpan LLC*, 29 F.4th at 1281 (Jordan, J., concurring). "In fact, the Tenth Circuit was completely silent about the application of downstream consequences to *Havens Realty*." *Id.* at 1282.

Finally, *Laufer* is a non-binding Tenth Circuit decision; whereas, the Ninth Circuit's decision in *CREEC* is binding on this Court. Thus, this Court is bound to follow *CREEC*. 867 F.3d at 1096, 1101-02.

### f.   *Center for Biological Diversity v. United States Environmental Protection Agency* **Is Distinguishable.**

NRF's reliance on *Center for Biological Diversity v. United States Environmental Protection Agency*, 937 F.3d 533 (5th Cir. 2019), (NRF's Amicus Br. at 4:12-14), is misplaced. Notably, the Fifth Circuit focused therein on the planned future activities of the members of three environmental organizations who had sued as plaintiffs because the plaintiffs (*i.e.*, the three entities) sought prospective (injunctive) relief. *Id.* at 539. Thus, the Fifth Circuit avoided analysis of whether the members of the three plaintiff organizations had been ***actually harmed*** based on their members' ***past*** activities. The Fifth Circuit held that one individual member of a plaintiff organization could not show "any adverse effect" because "someone who goes looking for pollution cannot claim an aesthetic injury in fact from seeing it." *Id.* at 540. The Fifth Circuit explained that "crucial to an aesthetic injury is that the aesthetic experience was actually offensive to the plaintiff." *Id.* It added, "A person cannot manufacture standing by voluntarily setting aside potential aesthetic interests (like viewing a pristine expense of ocean) to pursue an incompatible interest (like viewing oil spills)." *Id.* at 541. The Fifth Circuit stated that its analysis was consistent with "***the general rule*** that 'standing cannot be conferred by a self-inflicted injury.'" *Id.* (emphasis added) (citing *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018)). In other words, the Fifth Circuit seemed to recognize that exceptions to the general rule exist, but failed to elaborate as to such exceptions.

In addition, although the Fifth Circuit cited as support *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), *Clapper* held that "respondents cannot manufacture standing

merely by inflicting harm on themselves based on their fears of ***hypothetical future harm*** that is ***not certainly impending***." *Id.* at 416 (emphasis added). *Clapper* added, "We hold that respondents lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is ***certainly impending*** and because they cannot manufacture standing by incurring costs in anticipation of ***non-imminent harm***." *Clapper*, 568 U.S. at 422. By negative inference, if the plaintiffs in *Clapper* has sufficiently alleged certainly impending future injury, *i.e.*, imminent harm, then *Clapper* presumably would have found Article III standing to exist even if self-injury had been inflicted. Indeed, as mentioned above, the Supreme Court itself distinguished *Clapper* recently in *Cruz* precisely on such basis:

> "In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), for example, the plaintiffs attempted to manufacture standing by voluntarily taking costly and burdensome measures that they said were necessary to protect the confidentiality of their communications in light of the Government surveillance policy they sought to challenge. *Id.*, at 402, 133 S.Ct. 1138. Their problem, however, was that they could not show that they had been or were likely to be subjected to that policy in any event. *Id.*, at 416, 133 S.Ct. 1138."

*Cruz*, 142 S. Ct. at 1647.

Here, in contrast, although the FAC seeks injunctive relief as one of the multiple remedies sought herein, the FAC also seeks statutory damages for past CIPA violations. (FAC at 9:8.) That matters. "A plaintiff must demonstrate constitutional standing separately for each form of relief requested." *Davidson v. Kimberly–Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 185 (2000)). In other words, the standing analysis relevant to seeking prospective injunctive relief is not the same analysis required for seeking statutory damages for past wrongdoing. Indeed, in *Mendia*, which is a decision cited by NRF, the Ninth Circuit reversed the district court's dismissal of the plaintiff's complaint for lack of Article III standing upon finding that the plaintiff had adequately alleged

causation regarding past injury via his loss of liberty resulting from his pre-trial detention in county jail. *Mendia*, 768 F.3d at 1012-15. Notably, the Ninth Circuit conducted a separate standing analysis regarding "the ***future harm*** [plaintiff] claimed to fear." *Id.* at 1013 n.1 (emphasis added); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 109 (1983) (holding that the allegation that the plaintiff was illegally choked by the police "while presumably affording [plaintiff] standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part") (holding that notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief). Thus, instead of focusing exclusively on "impending" harm under *Clapper*, the standing analysis in the instant action must also consider the "actual" injury alleged to have taken place in the past.

In addition, the Fifth Circuit held that an aesthetic injury, by definition, is inconsistent and incompatible with an individual whose interest is to deliberately view oil spills. 937 F.3d at 541. Here, in contrast, there is nothing inconsistent with or incompatible with Plaintiffs' tester status, on one hand, and Plaintiffs' privacy interest being harmed by Defendant's wrongdoing, on the other hand, especially because Plaintiffs has alleged his dual motivations to visit the Website at issue. (FAC ¶ 16); *Harty v. Simon Prop. Group, L.P.*, 428 Fed. Appx. 69, 71 (2d Cir. 2011) (allegation that plaintiff "plans to return [to shopping mall] both as a patron ... and as a tester 'to determine whether the property has been made ADA compliant' " was sufficient to establish standing).

Furthermore, the Fifth Circuit made no attempt to reconcile its opinion with *Havens* or distinguish *CREEC*. And, *Center for Biological Diversity* was decided before *Cruz*.

Finally, *Center for Biological Diversity* is not binding on this Court; whereas, *CREEC* is binding.

**g.** ***National Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales* Is Unpersuasive.**

NRF's reliance on *National Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006), (NRF's Amicus Br. at 4:15-18), is misplaced.  The D.C. Circuit made no attempt to reconcile its decision with then-Judge Ginsburg's opinion in *Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989) (Ginsburg, J.), which cited the aforementioned analysis in Wright, Miller & Cooper, which, in turn, cited *Havens*.  The D.C. Circuit also made no direct attempt to reconcile its opinion with *Havens*, and the D.C. Circuit's opinion was decided before *Cruz*.  And, the D.C. Circuit's opinion therein is not binding on this Court; whereas, *CREEC* is binding.

Thus, NRF's contention that the FAC fails to sufficiently allege a cognizable "injury" under Article III of the U.S. Constitution is wrong.

**B.   Subdivision (a) of Section 631 of the California Penal Code Has Four Distinct Clauses All of Which Are at Issue.**

Subdivision (a) of Section 631 of the California Penal Code has four distinct clauses.  *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. 2021) (Holcomb, J.).  All four clauses are at issue here.

**C.   The First Clause Is Actionable.**

**1.   Plaintiffs' Use of Either a Smart Phone or a Computer to Visit Defendant's Website Satisfies the "Telegraph" or "Telephone" Requirement of the First Clause.**

NRF argues that the FAC fails to allege that wires between anyone's telegraph machine or telephone were tapped in California.  (NRF's Amicus Br. at 7:16-8:6.) Although it is true that the first clause limits its scope to "any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal

telephonic communication system," (Cal. Penal Code § 631(a)), the FAC expressly alleges that "Plaintiffs used either a smart phone (a cellular telephone with an integrated computer and an operating system that enables web browsing) or a wifi-enabled laptop that uses a combination of cellular and landline telephony." (FAC ¶ 17.) Given such allegation, it is reasonable to infer that either or both Plaintiffs used a smart phone to visit Defendant's Website. As alleged in the FAC, a smart phone is a cellular telephone with an integrated computer to enable web browsing. "The Oxford English Dictionary defines a smartphone as '*a mobile phone* capable of running general-purpose computer applications, now typically with a touch-screen interface, camera, and Internet access.'" *Semeran v. Blackberry Corp.*, 2016 WL 3647966, at \*4 (D.N.J. July 6, 2016) (citing Oxford English Online Dictionary, 2016, http://www.oed.com/ (last visited June 16, 2016)) (emphasis added). There is nothing in the plain meaning of subdivision (a) that supports defining the term, "telephone," within the first clause of subdivision (a) as excluding a smart phone. A smart phone surely fits within the definition of a "Cellular radio telephone," as defined in Cal. Penal Code § 632.7(c)(1), to mean "a wireless *telephone* authorized by the Federal Communications Commission to operate in the frequency bandwidth reserved for cellular radio telephones." (Cal. Penal Code § 632.7(c)(1)) (emphasis added). Although a smart phone is, by definition, a "wireless telephone" insofar as it is unnecessary to connect a smart phone itself physically to any device to operate its various features, it is common sense that a smart phone relies upon and cannot function without tremendous nationwide networks of telecommunications companies comprised of cellular towers, computer servers, and other electronic equipment comprised of "wire[s], line[s], cable[s], or instrument[s]" to transmit both voice calls and computer data to their intended recipients. Similarly, Defendant's Website surely uses telephone wires, lines, cables, or instruments to connect to the

Internet in order to communicate with any wifi-enabled laptop computer that Plaintiffs may have used to chat with Defendant on Defendant's Website.[4]

Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013). Indeed, in *In re Google Inc.*, the court noted that the California Supreme Court has interpreted the term "telegraph lines" "functionally" to include "telephone lines" as follows:

> "For example, in a previous evolution in communications technology, the California Supreme Court interpreted 'telegraph' ***functionally***, based on the type of communication it enabled. In *Davis v. Pacific Telephone & Telegraph*, the Supreme Court held that 'telegraph lines' in a criminal law proscribing the cutting of lines included telephone lines because '[t]he idea conveyed by each term is ***the sending of intelligence to a distance*** ... [thus] the term 'telegraph' means any apparatus for transmitting messages by means of electric currents and signals.'"

*In re Google Inc.*, 2013 WL 5423918, at *21 (emphasis added) (citing *Davis v. Pacific Telephone & Telegraph Co.*, 127 Cal. 312, 316 (1899); *Apple v. Superior Court*, 56 Cal. 4th 128, 137, 292 P.3d 883, 887 (2013) ("***In construing statutes that predate their possible applicability to new technology, courts have not relied on wooden construction of their terms. Fidelity to legislative intent does not 'make it impossible to apply a legal text to technologies that did not exist when the text was created***.... Drafters of every era

---

[4] Notably, section 631(a) states, "Any person who, by means of any machine, instrument, or contrivance, ***or in any other matter***, intentionally taps, or makes any unauthorized connection, ... is punishable ...." (Cal. Penal Code § 631(a)) (emphasis added). Thus, the first clause is not limited to wiretapping in which the method used is via a "machine, instrument, or contrivance" only. Prohibited wiretapping can also occur "in any other matter" as well. The Court should avoid interpreting section 631(a) in a manner that would render such phrase as mere surplusage. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006).

Moreover, in *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922 (N.D. Cal. 2015), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020), the court stated that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a). 140 F. Supp. 3d at 937 (emphasis added). The FAC expressly alleges that Defendant's software embedded on its Website was used to violate section 631(a). (FAC ¶ 28.)

know that technological advances will proceed apace and that the rules they create will one day apply to all sorts of circumstances they could not possibly envision.'") (citation omitted).  Indeed, in *Davis*, the California Supreme Court, in interpreting a Penal Code section containing the term "telegraph" to include "telephone" within its meaning, noted:

> "If the consideration could be limited to a strict etymological point of view, it would have to be conceded at once that there is a difference in the meaning of the two words,—the one conveying the idea of transmission of writing to a distance; the other, the transmission of sound to a distance.... The words ... cannot be limited to their etymological meaning, and ***consideration must be had to their present sense and acceptation***."

*Davis*, 127 Cal. at 316 (emphasis added).  Given that *In re Google Inc.*, recognized "the California courts' approach to ***updating obsolete statutes in light of emerging technologies***," as a basis to find that "section 631 of CIPA applies to emails," 2013 WL 5423918, at *21 (emphasis added), why wouldn't the first clause of section 631(a) of the Penal Code be interpreted to include wiretapping of smart phones and wifi-enabled laptops?  If telegraphs and telephones are recognized for "the sending of intelligence to a distance," *id.*, then surely smart phones and wifi-enabled laptops that are connected to the Internet either via a wired connection (via a dongle device) or a wifi connection surely "send[] intelligence to a distance" as well.  And, it is beyond dispute that smart phones and wifi-enabled laptops are connected to the Internet via "wire[s], line[s], cable[s], or instrument[s]."  (Cal. Penal Code § 631(a).)

In addition, section 631(a), which is part of CIPA, should be broadly construed.  *In re Google Inc.*, 2013 WL 5423918, at *21.

Furthermore, section 632.7 of the California Penal Code was enacted in 1992.  Thus, the California Legislature has had literally decades to amend section 631(a) to clarify that the reference to "telephone" in the first clause excludes "cellular radio telephones," but the Legislature has failed to do so over the years.  If anything, the Legislature's failure to amend section 631(a) to expressly refer to a "landline" telephone

as opposed to a broader "telephone" term reflects the Legislature's acquiescence in a broad interpretation of the "telephone" term, which is undefined in section 631(a).

### 2. The First Clause Includes the Conduct of Participants to Internet Communications.

Defendant contends that the Plaintiffs' section 631(a) claim fails as a matter of law because of a party exemption.  (Def.'s Mem. at 16:14-18:3.)  NRF contends that the participant exemption applies to both wiretapping (first clause of section 631(a)) and eavesdropping (second clause).  (NRF's Amicus Br. at 6:16-7:15.)

Defendant and NRF are both wrong.

### a. Unlike the Federal Wiretap Act, the First Clause Provides No Direct Party Exception.

There is no party exemption under the first clause of section 631(a).  Unlike the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*, which expressly sets forth a direct party exception to liability, *see* 18 U.S.C. § 2511(2)(d); *Popa v. Harriet Carter Gifts, Inc.*, 45 F.4th 687, 694 (3d Cir. 2022), ***section 631(a) of the Penal Code contains no such direct party exception***.  *See People v. Conklin*, 12 Cal. 3d 259, 270 (1974).  Section 631(a) imposes an "all-party consent rule" unlike the Federal Wiretap Act.  *People v. Conklin*, 12 Cal. 3d 259, 270 (1974).  If the California Legislature intended for section 631(a) to duplicate the scope of the Federal Wiretap Act by carving out a direct party exception, then surely the Legislature would have done so by now given that the Wiretap Act has been in existence for many decades since 1968 (or since 1986 when that Act was amended).  Thus, Defendant's reliance on how the Federal Wiretap Act is interpreted, (Def.'s Mem. at 16:27-17:16), is misplaced.

Indeed, it is highly significant that section 631 of the Penal Code includes the following clause as part of the third clause:

> "or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained…"

(Cal. Penal Code § 631(a).)  Such language is inconsistent with a party exemption.

**b.    The Undefined Term "Unauthorized" Within Section 631 Is
Intended to Include Lack of Consent by the Consumer.**

Although *Rogers v. Ulrich*, 52 Cal. App. 3d 894 (1975), which is a decision cited by both Defendant and NRF, noted that the term "unauthorized connection" (within the first clause of section 631) was "vague and nowhere defined," *Rogers*, 52 Cal. App. 3d at 898, *Rogers* failed to recognize that in *People v. Jones*, 30 Cal. App. 3d 852 (1973), the Court of Appeal, in interpreting the then-existing version of section 631 of the Penal Code enacted in 1967, held that the word "unauthorized" before the word "connection" should be interpreted to mean that the "authorization" required for a legal wiretap is the "consent of the subscriber to the telephone." 30 Cal. App. 3d at 854.  If the subscriber to the telephone "did not consent to the tap," *id.*, then the connection is "unauthorized" under the then-applicable section 631 of the Penal Code.  *Jones*, 30 Cal. App. 3d at 854.

In support, *Jones* cited *People v. Trieber*, 28 Cal. 2d 657 (1946), which, in turn, interpreted the then-applicable section 640 of the Penal Code as holding that "a telephone company cannot authorize others to make a connection to a subscriber's individual station ***without his approval***." *Id.* at 662 (emphasis added).  Notably, former section 631 of the Penal Code was derived from former section 640 of the Penal Code,[5] 30 Cal. App. 3d at 854, the latter of which was construed by the High Court as "prohibiting wire tapping" and "forbids unauthorized interception of private messages," *Trieber*, 28 Cal. 2d at 662.

Thus, the undefined term "unauthorized connection" within the first clause of section 631 includes circumstances in which the ***consumer*** has not provided his or her consent to other participants' use of information obtained from a wire communication.

**c.    *Rogers v. Ulrich* Is Unpersuasive.**

Defendant's (and NRF's) reliance upon *Rogers v. Ulrich*, 52 Cal. App. 3d 894 (1975), is misplaced.  *Rogers* quoted only a portion of the then-applicable version of Penal Code section 631 in footnote 1 of its decision.  *Rogers*, 52 Cal. App. 3d at 898 n.1.

---

[5] Section 631 of the Penal Code was originally enacted in 1967, which was the same year in which the Legislature repealed the predecessor statute, section 640 of the Penal Code. *People v. Superior Court*, 13 Cal. App. 3d 545, 548 (1970).

Notably, *Rogers* omitted significant portions of statutory language that is also contained in subdivision (a).[6]  Thus, *Rogers*'s conclusion that the then-applicable version of section 631 of the Penal Code does not include "participant recording" ignored a crucial portion of the statute as part of its analysis.  This matters because *Rogers* explained that "[a]s to the third [prohibited] method" "of obtaining information being sent over a telephone or telegraph line," "a recording made by a participant does not intercept the message while it is in transit; the recording rather transcribes the message as it is being received." *Rogers*, 52 Cal. App. 3d at 898.  The omitted clause mentioned above demonstrates that even if a participant to a communication does not intercept the message while it "is in transit," the Legislature intended to prohibit the unauthorized use "in any manner" "or for any purpose" "or to communicate in any way" "any information" obtained via such use.  Surely, that includes recordings of private communications exchanged via a wire.

Furthermore, although *Rogers* relied upon section 630 of the Penal Code for its "declaration of legislative finding and intent," *Rogers*, 52 Cal. App. 3d at 898-99, *Rogers* erred in its interpretation of section 630.[7]  *Rogers* stated that section 630 "speaks of preventing eavesdropping and other invasions of privacy, thus suggesting that participant recording was not meant to be included." *Id.* at 899.  Simply put, *Rogers* overemphasized the reference to "eavesdropping" within section 630.  The main gist of section 630 is that "advances in science and technology" had created new opportunities via "new devices and techniques" implicitly a reference to recording devices including tape recorders, by way of example, that "created a serious threat to the free exercise of personal liberties,"

---

[6] *Rogers* omitted the clauses: "***or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained***, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section ...." (Cal. Penal Code § 631(a)) (emphasis added).

[7] Section 630 of the Penal Code states in relevant part as follows: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.  [¶].  The Legislature by this chapter intends to protect the right of privacy of the people of this state." (Cal. Penal Code § 630.)

and that the Legislature intended to protect "the right of privacy" via the CIPA, *i.e.*, Chapter 1.5 of Title 15 of Part 1 of the Penal Code. Indeed, in *Ribas v. Clark*, 38 Cal. 3d 355 (1985), in which the statute at issue was section 631, *Ribas*, 38 Cal. 3d at 359, the Supreme Court explained that: "In enacting this statute, the Legislature declared in broad terms its intent 'to protect the right of privacy of the people of this state' from what it perceived as 'a serious threat to the free exercise of personal liberties [that] cannot be tolerated in a free and civilized society." (Pen. Code, § 630.) This philosophy appears to lie at the heart of virtually all the decisions construing the Privacy Act." 38 Cal. 3d at 359. Thus, section 630 sets forth the public policy that favors Plaintiffs' interpretation. In *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183 (2021), the Supreme Court characterized the Legislature's intent as reflective of the entire CIPA. (*Smith*, 11 Cal. 5th at 199) ("In enacting [the Invasion of Privacy Act] ...") (quoting *Ribas*). Defendant's analysis fails to address such public policy.

Indeed, if section 630 states the Legislature's intent solely to address third party eavesdropping on private communications in CIPA, then how does one reconcile the Supreme Court decisions in *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 122 (2006) ("it is unlawful under California law for a party to a telephone conversation to record the conversation without the knowledge of all other parties to the conversation"), pertaining to section 632 and *Smith* pertaining to section 632.7? Notably, section 632 of the Penal Code was enacted in 1967 as part of CIPA. The Supreme Court has characterized section 632 as "[a] foundational component of [CIPA]". *Smith*, 11 Cal. 5th at 191. Needless to say, *Rogers* was decided in 1975, and so it did not have the subsequent guidance provided in *Kearney* and *Smith* addressing the indisputable fact that CIPA provisions are not limited to eavesdropping by third parties.

Furthermore, as mentioned above, *Rogers* failed to recognize the long history by which the term "unauthorized" had been interpreted to include circumstances in which the consumer has not provided his or her consent to other participants' use of information obtained from a wire communication. *Jones*, 30 Cal. App. 3d at 854; *Trieber*, 28 Cal. 2d

1    at 662.

2        Although *Ribas v. Clark*, 38 Cal. 3d 355 (1985), cited *Rogers* for the proposition

3    that "Section 631 was aimed at one aspect of the privacy problem—eavesdropping, or the

4    secret monitoring of conversations by third parties," 38 Cal. 3d at 359, *Ribas* had no

5    occasion to decide the question as to whether section 631 included the conduct of

6    ***participants*** to wire communications.  *Nolan v. City of Anaheim*, 33 Cal. 4th 335, 343

7    (2004) ("A decision … does not stand for a proposition not considered by the court.").

8        Finally, although *Rogers* referred to the significance of "eavesdropping" within

9    section 630, it is beyond dispute that the first clause of section 631(a) prohibits the act of

10   wiretapping instead of eavesdropping.  (Cal. Penal Code § 631(a)) ("Any person who ...

11   intentionally taps, or makes an unauthorized connection ...."). Thus, at most, *Rogers*

12   should be narrowly interpreted as applicable only to claims asserting the violation of the

13   second clause regarding eavesdropping.

14          **d.    *Smith v. LoanMe, Inc.* Provides Important Guidance.**

15       *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183 (2021), supports Plaintiffs' position because

16   the Supreme Court:  (1) held that "section 632.7 applies to parties as well as nonparties,"

17   11 Cal. 5th at 188, despite the language of that statute referring to "intercepts" or

18   "receives," which the Court of Appeal therein (incorrectly) construed as referring to only

19   nonparties; (2) rejected the Court of Appeal's conclusion that parties to a call were

20   excluded from section 632.7's scope based on the Court of Appeal's reasoning that

21   "parties to a call normally consent to other participants' 'receipt' of their input," 11 Cal.

22   5th at 194; (3) held that under a plain meaning analysis, a broad interpretation of section

23   632.7 to include parties to a phone call (involving a cellular phone or cordless phone) was

24   the more plausible reading of section 632.7(a), 11 Cal. 5th at 194; (4) analyzed the

25   legislative history of section 632.7, *id.* at 196-99, and cited with approval *Oncale v.*

26   *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998), for the proposition that statutory

27   prohibitions "often go beyond the principal evil to cover reasonably comparable evils,

28   and it is ultimately the provisions of our laws rather than the principal concerns of our

legislators by which we are governed," *Smith*, 11 Cal. 5th at 198-99; (5) cited its broader interpretation as better promoting the statutory scheme's goal of protecting privacy in communications, *Smith*, *id.* at 199-200; (6) noted that public policy is appropriate to consider as part of any statutory interpretation analysis, *id.* at 190 ("If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and ***public policy***.") (emphasis added); and (7) described how "section 632.7(a)'s lack of a malice requirement" "function[s] to describe a class of potential perpetrators that includes parties, even if sections 632.5(a) and 632.6(a) do not" because the latter two provisions contain the word "maliciously," 11 Cal. 5th at 195.

Here, there is nothing specific in the language of subdivision (a) that excludes a party to the chat communication at issue from being liable for violating section 631(a). Also, there is a noticeable lack of any ***malice*** requirement in subdivision (a), which functions "to describe a class of potential perpetrators that includes parties". *Smith*, 11 Cal. 5th at 195.

### e. *People v. Carella* **Does Not Support Defendant.**

Defendant's reliance upon *People v. Carella*, 191 Cal. App. 2d 115 (1961), (Def.'s Mem. at 10 n.6), is misplaced.  In that decision, a stenographer from the District Attorney's office answered approximately 45 telephone calls in an individual's apartment after his arrest for bookmaking. *Id.* at 137.  The stenographer recorded in shorthand the ensuing conversations. *Id.*  Although the defendants in the criminal case argued that the receipt of the messages by the stenographer constituted an interception of communications ***intended for the arrested individual*** and, as a result, violated former section 640 of the Penal Code, which was the predecessor of section 631(a) of the Penal Code, the Court of Appeal disagreed.  The Court of Appeal explained, "The fact that someone other than the intended recipient answers a telephone and receives the message transmitted does not establish a violation of . . . section 640 of the Penal Code." 191 Cal. App. 2d at 138.  Significantly, the Court of Appeal elaborated, "In each instance the sender intended to

give a message to the person who actually answered the telephone . . . ." *Id.*  Thus, there was no prohibited "unauthorized connection" under these circumstances.  That is, the callers knew they were speaking with the stenographer, even if they did not appreciate her role within law enforcement.

**D.     The Second Clause Is Actionable.**

Multiple federal courts have held that the second clause of section 631(a) includes Internet communications.[8]

**1.     The FAC Alleges that a Third Party Violated the Second Clause.**

Defendant's analysis assumes that the second clause of section 631(a) could not have been violated against Plaintiffs because Defendant, itself, cannot be a third party eavesdropper who violated such clause.  (Def.'s Mem. at 16:14-18:3.)   However, assuming *arguendo* that Defendant itself cannot be held liable for violating the second clause (which is disputed for the reasons set forth above in I.C.2, *supra*), Defendant conveniently ignores that it employed an independent, third party eavesdropper who violated such clause.  (FAC ¶ 11.)  *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520-21 (C.D. Cal. 2021) (Aenlle-Rocha, J.), *Yoon*, 549 F. Supp. 3d at 1081, and *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019), support Plaintiffs' position that an independent, third party company violated the second clause as an eavesdropper.  (FAC ¶ 11.)  *Saleh* explained that "FullStory is a separate legal entity that offers 'software-as-a-service' and not merely a passive device.  Defendants' argument would imply that any third party who surreptitiously recorded a conversation between two parties would not violate § 631(a) so long as it was recording the conversation at the direction and for the benefit of a party.  The text of section 631(a), however, does not contain any such exception ...."  *Saleh*, 562 F. Supp. 3d at 520.  In support, *Saleh* cited *Revitch*, the latter of which explained that "it cannot be that anyone who receives a direct

---

[8] *See, e.g.*, *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) (holding that CIPA "applies to internet communications"); *Matera v. Google Inc.*, 2016 WL 200619, at *18 (N.D. Cal. Aug. 12, 2016); *In re Google Inc.*, 2013 WL 5423918, at *21; *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 826 (N.D. Cal. 2020).

signal escapes liability by becoming a party to the communication.  Someone who presses up against a door to listen to a conversation is no less an eavesdropper just because the sound waves from the next room reach his ears directly.  That person remains a third party, even as a direct recipient of the speaker's communication."  2019 WL 5485330, at *2; *see also Yoon*, 549 F. Supp. 3d at 1081 (citing *Revitch*) ("[I]s Quantum Metric a tape recorder held by Lululemon, or is it an eavesdropper standing outside the door?  This is a question of fact for a jury, best answered after discovery into the storage mechanics of Session Replay.").

NRF's reliance upon *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021), to argue that Defendant's third party chat provider is a mere "extension" of Defendant, (NRF's Amicus Br. at 10:15-16), is misplaced.  Although *Graham* sought to distinguish *Revitch* because the latter decision purportedly involved a fact pattern in which the vendor "used the data itself," *Graham*, 533 F. Supp. 3d at 832, *Revitch* drew no such distinction.  And, *Yoon* was not persuaded by *Graham*.  *Yoon*, 549 F. Supp. 3d at 1081.

Plaintiffs anticipate that Defendant shall rely upon a recent decision in *Williams v. What If Holdings, LLC*, 2022 WL 17869275 (N.D. Cal. Dec. 22, 2022), in support of Defendant's reply.  Any such reliance would be misplaced.  Indeed, if anything, *Williams* supports Plaintiffs' position because the district court therein drew a sharp distinction between the factual allegations at issue therein versus the allegations in other decisions such as *Saleh* and *Yoon*.  *See Williams*, 2022 WL 17869275, at *3-*4.  In particular, the court relied upon allegations of recordation that is "routine documentation" as opposed to "data mining."  *Id.* at *3.  Significantly, the court noted that the outcome of its holding would have been different if the third party "affirmatively engages with that data in any way other than to store it," *id.* at *3.  Thus, if the complaint in *Williams* had alleged that the third party engages with chat data in any way other than to store it, then the district court surely would have found that the defendant software company, which offered its software product whose code is embedded onto customer websites, constituted a third-party eavesdropper.  Here, in contrast, the FAC affirmatively alleges that an independent,

third party engaged in data mining of consumers' chat sessions.   (FAC at 2:4-5) ("Defendant ... pays a third party to interce[]pt and eavesdrop on such communications ... in order to harvest data from those conversations for financial gain.").

> **2.      The FAC Plausibly Alleges the "While" "In Transit or Passing Over"**
> **Requirement of the Second Clause.**

Defendant challenges the FAC's allegations of intercepted communications by a third party company while "in transit" as conclusory.  (Def.'s Mem. at 9:15-15:13.)  This Court should reject Defendant's argument.  *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014) ("[T]he complaint's allegation that users' messages were intercepted in transit is to be taken as true at this stage of the case.").  Paragraph 11 of the FAC suffices.

Defendant's argument ignores case law recognizing as plausible allegations regarding the existence of software technology called "Session Replay," which "embeds snippets of code that watch and record, in real time, 'a visitor's every move on a website,'" and which enables the website to "capture data regarding visitors to [the merchant's] website." *Saleh*, 562 F. Supp. 3d at 509; *see also Yoon*, 549 F. Supp. 3d at 1077; *Revitch*, 2019 WL 5485330, at *1.  In *Saleh*, the Court cited the allegation that the third party whose software was embedded into a website's code "records the website user's interactions locally in the user's browser in real time, and then transmits that information to [the third party's] recording servers every few seconds, which [the third party] then makes available to its clients." *Saleh*, 562 F. Supp. 3d at 521.  The Court held that the section 631(a) claim therein plausibly alleged a cognizable claim.  *Id.* at 521.  *Yoon* and *Revitch* lend additional support.  The Court can and should reasonably infer from the FAC's allegations that Defendant and its third party use similar embedded computer code to capture the website user's interactions while using Defendant's chat feature.

Defendant's reliance on *Adler v. Community.com, Inc.*, 2021 WL 4805435 (C.D. Cal. Aug. 2, 2021) (Blumenfeld, J.), (Def.'s Mem. at 9:6-9; 13:1-14:2; 15:11-13; 16:8-11), is misplaced.  Although the plaintiffs alleged that the defendant entity accessed the

plaintiffs' text communications intended for the defendant's celebrity clients before they actually reached the celebrities, the Court held that the proper inquiry was whether "acquisition" was "contemporaneous with transmission" "in a technical sense," which the plaintiffs failed to allege. *Id.* at \*3-\*4.  The Court held that the defendant allegedly accessed the text communications "upon the completion of its transmission to the proper number." *Id.* at \*4.  Notably, the Court made no attempt to address the effect of automatic routing software on its analysis.  Indeed, *Adler* was decided before *Saleh*.  *Saleh*, 562 F. Supp. 3d at 521.  And, the Court failed to distinguish either *Yoon*, 549 F. Supp. 3d at 1077, or *Revitch*, 2019 WL 5485330, at \*1.

Defendant's reliance upon *Mastel v. Miniclip*, 549 F. Supp. 3d 1129 (E.D. Cal. 2021), (Def.'s Mem. at 9:17-23), is misplaced.  In *Mastel*, the district court stated that "the crucial question under § 631(a)'s second clause is whether [plaintiff] has plausibly alleged that [defendant] read one of his communications while it was still in transit, i.e., ***before*** it reached its intended recipient."  549 F. Supp. 3d at 1137 (emphasis added).  *Mastel* failed to distinguish, let alone, acknowledge the Ninth Circuit's holding in *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), which expressly held that section 631(a) claims can be predicated upon "simultaneous," unknown duplication of a user's communications to the intended recipient.  *Id.* at 608; *see also Rodriguez v. Google LLC*, 2021 WL 6621070, at \*4 (N.D. Cal. Aug. 18, 2021) (indicating that the plaintiffs' first amended complaint had pled the "requisite § 631 simultaneity," but that the operative complaint no longer pled it); *In re Vizio, Inc.*, 238 F. Supp. 3d 1204, 1226-27 (C.D. Cal. 2017) (Staton, J.).  Thus, *Mastel* is unpersuasive and directly conflicts with the Ninth Circuit's opinion in *In re Facebook, Inc. Internet Tracking Litig*.

Defendant's reliance upon *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 938, 953-54 (N.D. Cal. 2014), (Def.'s Mem. at 12:5), is misplaced.  The district court held, "Though NovelPoster claims that Yancher and Grinberg were never able to access their email accounts due to the defendants' alleged actions, any subsequent reading or

forwarding of those emails by the defendants does not constitute an illegal 'interception.'" *Id.* at 953. That is because "reading emails that have already been received in an email account's inbox does not constitute 'intercept[ion]' under the [federal Wiretap Act]." *Id.* at 952. In *In re Vizio, Inc.*, *supra*, the Court characterized *NovelPoster* as a decision involving the collection of emails "that were unquestionably in electronic storage *for a substantial period before the defendants collected them*." 238 F. Supp. 3d at 1226 (emphasis added). Moreover, *NovelPoster* stated that "'*unless some type of automatic routing software is used* (for example, a duplicate of all of an employee's messages are *automatically sent* to the employee's boss), interception of E-mail within the prohibition of the Wiretap Act is virtually impossible." 140 F. Supp. 3d at 952 (emphasis added) (quoting *United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003) (citation omitted)). By negative inference, the use of automatic routing software allows for interception of electronic communications *during transmission* to occur.

Needless to say, the FAC in the instant action alleges that precisely such automatic routing software was used by Defendant to perpetrate their undisclosed eavesdropping scheme. (FAC ¶ 11) (alleging the use of embedded software created by third party providers who license such technology to Defendant and who receive Plaintiffs' communications for data harvesting purposes). Thus, *NovelPoster*, if anything, supports Plaintiffs' position.

Defendant's reliance on *Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026 (N.D. Cal. 2014), (Def.'s Mem. at 14:3-19 & n.11), is equally misplaced. The court therein quoted *NovelPoster* for the proposition that "'unless some type of automatic routing software is used' to divert the text message, 'interception of [a text message] within the prohibition of the Wiretap Act is virtually impossible.'" *Id.* at 1031 (quoting *NovelPoster*, 140 F. Supp. 3d at 952). In other words, *Sunbelt Rentals, Inc.* recognized that interception of electronic communications during transmission (*i.e.*, while in transit or passing over a

wire) can, in fact, occur if "some type of automatic routing software is used".[9]  Thus, if anything, *Sunbelt Rentals* supports Plaintiffs' position.

Defendant's reliance on *Rosenow v. Facebook, Inc.*, 2020 WL 1984062 (S.D. Cal. Apr. 27, 2020), is misplaced because of factual differences.  In *Rosenow*, the plaintiff's allegations strongly indicated that the National Center for Missing and Exploited Children acquired the plaintiff's communications while it was in electronic storage as opposed to during transmission.  *Id.* at *2.  In essence, the plaintiff's complaint made a judicial admission, which the district court could not ignore.  In contrast, no such judicial admission exists here.

Defendant's reliance on *People v. Wilson*, 17 Cal. App. 3d 598 (1971), (Def.'s Mem. at 10:4-15), is misplaced.  In that decision, the Court of Appeal affirmed the judgment convicting the defendant of the criminal offense of conspiracy to transport marijuana after rejecting the defendant's argument on appeal that the trial court erred by denying the defendant's motion to suppress evidence.  The Court of Appeal assumed that the defendant sought to suppress the green slips by which the telephone answering service that the defendant had subscribed to would reduce to writing incoming messages that were received on the answering service's telephone number (after the defendant had given such telephone number to persons).  Most of the messages came from Tijuana, Mexico.  *Id.* at 600.  A narcotics agent instructed such employees to notify him of any calls intended for the defendant.  *Id.*  Although the defendant relied upon section 631 to argue that the divulgence of the communications from Tijuana was unlawful, the Court of Appeal disagreed.  *Id.* at 602-03.  The main holding of the Court of Appeal was that the answering service had received "the consent of all parties to the communications," which were later divulged to the narcotics agent.  *Id.*  The alternative holding was that "within the meaning of the section the information received by the answering service was not obtained while

---

[9] Notably, the counterclaimant in *Sunbelt Rentals, Inc.* made no attempt to allege that his electronic communications were intercepted by the counterdefendant by using some type of automatic routing software.  Thus, the allegations in *Sunbelt Rentals, Inc.* are dissimilar from the allegations in the FAC here.

the communications from Tijuana were in transit or passing over any wire, but was obtained after and not 'while' they were in transit or passing 'over' the telephone wire." *Id.* at 603.  The alternative holding in *Wilson* is unremarkable because, as a factual matter, the employees of the answering service transcribed the messages from the callers located in Tijuana *after* they received such phone calls.  Indeed, the decision does not specify the precise length of time that it took to prepare and finalize a particular "green slip."  It could have been 15 minutes later or even an hour later.  Under these circumstances, it would have been improper for the Court of Appeal to conclude as a matter of law that the preparation of the green slips was contemporaneous to the incoming phone calls from Tijuana.

NRF's reliance on *In re Vizio, Inc.*, 238 F. Supp. 3d 1204, 1227-28 (C.D. Cal. 2017) (Staton, J.), (NRF's Amicus Br. at 9:24-10:1), is misplaced as that decision is distinguishable because the plaintiffs included in their complaint a "rather inscrutable graphic with no textual explanation," which "suggests that [defendant] transmits their data to its Inscape platform *significantly after* the data arrive at their Smart TVs."  *Id.* at 1228 (emphasis added).  Thus, the complaint therein made what appeared to be a judicial admission that the plaintiffs' data was held in storage for a significant period of time and was not acquired during transmission contemporaneously.

NRF's reliance upon *Rodriguez v. Google LLC*, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022), is misplaced.  The allegations in *Rodriguez* are totally dissimilar to those at issue here.  Notably, the operative complaint in *Rodriguez* alleged that defendant Google uploaded consumers' data to its servers for developers' use (with the consent of consumers), "but that Google also retained a copy for its own use."  *Id.* at *2.  The plaintiffs alleged that Google's act of sending a "second copy to itself" was improper.  *Id.* Significantly, in *Rodriguez*, there was not any allegation of any use of any automatic routing software to an independent, third party, unlike the allegations at issue here.  (FAC ¶ 11.)  Thus, NRF's reliance on *Rodriguez* is akin to comparing apples to oranges.

Finally, Plaintiffs anticipate that Defendant shall rely upon *Mireskandari v. Mail*, 2013 WL 12129559, at *10 n.44 (C.D. Cal. July 30, 2013) (Morrow, J.), in its reply.  Any such reliance would be misplaced.  Although the plaintiff sued under section 631(a) of the Penal Code, the Court held that "Plaintiff fails to plausibly to plead that [defendant] intercepted any electronic communication while it was in transit; ***at most, he alleges the illegal disclosure of data [defendant] held in storage***."  *Id.* at *10 & n.44 (emphasis added).  In contrast, the FAC here plausibly alleges the unlawful disclosure of Plaintiffs' communications to an independent, third party company while it was in transit for data harvesting purposes.  (FAC ¶ 11, at 2:2-5.)

### 3.     The Second Clause Is Not Limited to Eavesdropping Occurring Via Computer Servers Located in California.

Defendant makes a fleeting argument that the FAC fails to state a claim under the second clause because it fails to allege that Defendant or its independent, third party chat provider intercepted Plaintiffs' chats while located within the state of California.  (Def.'s Mem. at 13 n.10.)  In support, Defendant relies upon *Hammerling v. Google, Inc.*, 2022 WL 17365255, at *11 (N.D. Cal. Dec. 1, 2022), *appeal docketed*, No. 22-17024 (9th Cir. Dec. 30, 2022).  *Hammerling* is distinguishable.  In *Hammerling*, the plaintiffs, two individuals, were "out-of-state residents."  *Id.*  In a prior decision, the district court had indicated that the plaintiffs were "Florida residents."  *Hammerling v. Google, Inc.*, - F. Supp. 3d -, 2022 WL 2812188, at *1 (N.D. Cal. July 18, 2022).

In contrast, Plaintiffs are California citizens, (FAC ¶ 4), who seek to represent a class of "[a]ll persons within California who within the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website using cellular or landline telephony, and (2) whose communications were recorded and/or eavesdropped upon without prior consent," (FAC ¶ 20).  Thus, the Court can and should infer that Plaintiffs were both within California at the time that they sent and received chats with Defendant's Website.  Notably, the second clause of section 631(a) provides in relevant part:

"Any person . . . who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, ***or is being sent from, or received at any place within this state*** . . . is punishable by a fine . . . ."

(Cal. Penal Code § 631(a)) (emphasis added). Thus, the FAC sufficiently alleges that the "communication" was "sent from, or received at any place within this state." *Id.*

### E.   The Third and Fourth Clauses Are Actionable.

Given that Plaintiffs state a claim under both the first and second clauses of section 631(a), Plaintiffs similarly state a claim under the third and fourth clauses. As was the case in *Revitch*, the defendant website merchant "violated section 631 by ***enabling*** [a third party's] wrongdoing." *Revitch*, 2019 WL 5485330, at *2 (emphasis added), *quoted in Saleh*, 562 F. Supp. 3d at 521; *Revitch*, 2019 WL 5485330, at *2 ("it does not follow that parties to communications are immune from section 631 liability").

### F.   NRF's Statute of Limitations Argument Is Without Merit and Flatly Contradicts Defendant's Position.

NRF inexplicably raises the statute of limitations affirmative defense despite the fact that Defendant failed to do so itself.[10] (NRF's Amicus Br. at 4:21-5:23.) It is black letter law that the statute of limitations defense is waivable. *See Bagdasaryan v. City of Los Angeles*, 2020 WL 2770689, at *2 (C.D. Cal. Mar. 24, 2020) (Staton, J.). Thus, the Court should not consider NRF's argument because Defendant has waived it.

In any event, NRF's argument is without merit. The FAC alleges that Plaintiffs visited Defendant's Website "[w]ithin the statute of limitations period[.]" (FAC ¶ 17.) It is black letter law that the applicable statute of limitations under CIPA is one year.

---

[10] NRF's argument that page 3 of Defendant's Memorandum asserts a statute of limitations argument, (NRF's Amicus Br. at 5:1), is false. Indeed, given that Defendant relies on extrinsic evidence that Plaintiff Valenzuela's chat occurred on August 6, 2022 and Plaintiff Licea's chat occurred on August 9, 2022, (Burling Decl. ¶¶ 3-4; Doc. 26-2; Page ID #1619), Defendant's failure to assert the statute of limitations defense is not surprising. After all, Defendant would be making a frivolous argument by asserting the statute of limitations defense if Plaintiffs' chats occurred in August 2022.

*Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 134 (N.D. Cal. 2020) ("Under the CIPA, the applicable statute of limitations is one year.") (citing *Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 880 (1980); Cal. Civ. Proc. Code § 340(a) ("Within one year: (a) An action upon a statute for a penalty or forfeiture, if the action is given to an individual....").  Given that the original Complaint was filed on September 9, 2022, (Doc. 1), this Court can and should infer that the FAC sufficiently alleges that Defendant's wrongdoing occurred sometime between September 9, 2021 and September 9, 2022.  *Barker v. Riverside County Office of Education*, 584 F.3d 821, 824 (9th Cir. 2009) ("we must draw inferences in the light most favorable to the plaintiff").

NRF mistakenly seeks to invoke a heightened pleading standard.  In addressing its plausibility legal standard on a Rule 12(b)(6) motion, the U.S. Supreme Court noted that "we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9[.]"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007).

If Defendant seeks the precise dates of Plaintiffs' chats, Defendant can take discovery as to such details.  *Twombly*, 550 U.S. at 556 (stating that Rule 8(a) of Federal Rules of Civil Procedure "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support allegations).  But, as mentioned above, Defendant claims to already know the precise dates of Plaintiffs' chats.  (Burling Decl. ¶¶ 3-4.)  Thus, NRF's argument reflects an abject failure to review Defendant's moving papers, which completely undermines NRF's argument.

## G. The Term "Landline Telephone" Should Be Broadly Construed to Include Defendant's Computer Equipment.

Defendant argues that the alleged violation of section 632.7 fails to state a claim because the FAC does not allege that Defendant utilized a landline telephone to communicate with Plaintiff.  (Def.'s Mem. at 18:4-22:11.)  The Court should broadly construe the term, "landline telephone," in section 632.7(a) of the Penal Code, which is undefined, ***functionally*** as encompassing Defendant's computer equipment, which

connected with Plaintiffs' smart phone to transmit and receive Plaintiffs' chat communications. *In re Google Inc.*, 2013 WL 5423918, at *21. Indeed, the fact that the Legislature defined the term, "Communication," to include data transmissions, (Cal. Penal Code § 632.7(c)(3)), supports Plaintiffs' position.[11] In addition, it is beyond dispute that, "The Internet works through a series of networks that connect devices around the world ***through telephone lines***."[12] If Defendant is using telephone lines to connect its computer servers and other equipment to the Internet, then surely the devices it is using to connect to the Internet are functionally equivalent to the "landline telephone" term in section 632.7(a) of the Penal Code.

## H.   The FAC Sufficiently Alleges the Absence of Consent to the Recording of Plaintiffs' Communications.

Defendant contends that the FAC fails to plead their lack of consent to be recorded in the context of Plaintiffs' section 632.7 claim. (Def.'s Mem. at 22:12-24:15.) Not so. (*See* FAC ¶¶ 18-19, 30, 35.) "'Consent may be express or may be implied in fact from the '***surrounding circumstances*** indicating that [the party to the call] ***knowingly agreed*** to the surveillance.'"" *NEI Contracting and Engineering, Inc. v. Hanson Aggregates Pacific Southwest, Inc.*, 2016 WL 4886933, at *3 (S.D. Cal. Sept. 15, 2016) ("*NEI*") (citing cases) (emphasis added). "The critical question is whether the party whose communications were intercepted had ***adequate notice of the interception***." *Id.* (citing *Campbell*, 77 F. Supp. 3d at 846-48) (emphasis added). "In the typical implied in fact consent scenario, a party is informed that his call will be recorded, and he continues to use the communication system ***after receiving notice the communications are being***

---

[11] The phrase, "communications transmitted by … data," surely includes text messages. Notably, although text messages can be sent via a hand-held device, users can also send text messages "***from a computer***." https://www.techtarget.com/searchmobilecomputing/definition/texting (last visited Jan. 17, 2023) (emphasis added) ("Text messaging is the act of sending short, alphanumeric communications between cellphones, pagers or other hand-held devices, as implemented by a wireless carrier. . . . Users send messages through SMS (short message service). Users can also send text messages ***from a computer to a hand-held device***. Web texting, as it's called, is made possible by websites called SMS gateways.") (emphasis added).
[12] https://www.britannica.com/technology/Internet/Society-and-the-Internet (last visited Jan. 17, 2023) (emphasis added).

*intercepted*." *NEI*, 2016 WL 4886933, at *3 (citing *Negro v. Superior Court*, 230 Cal. App. 4th 879, 892 (2014)) (emphasis added).  "In the absence of such notice, ''[t]he surrounding circumstances must **convincingly show** that the party **knew about and consented to the interception** in spite of the lack of formal notice or deficient formal notice.''" *Negro*, 230 Cal. App. 4th at 892 (emphasis added).

> **1.    The FAC Did Not Make Any Judicial Admission that Plaintiffs**
> **Consented to Defendant's Wrongful Conduct.**

The FAC does not make any type of judicial admission that Plaintiffs expressly consented to Defendant's wrongful conduct.  Also, the FAC does not make any type of judicial admission indicating that Plaintiffs impliedly consented to Defendant's wrongful conduct.

> **2.    Defendant's Reliance on *NEI* Is Misplaced.**

Defendant's reliance upon *NEI*, *supra*, is misplaced.  In *NEI*, the district court, after conducting a bench trial, made findings of fact and conclusions of law that the plaintiff entity "has failed to show that [defendant] recorded the November 21, 2011, call without [plaintiff's] consent," and, thus, entered judgment in favor of the defendant.  2016 WL 4886933, at *6.  Significantly, the court found that the plaintiff's owner, whose call with defendant was at issue, "does not dispute that he would have consented to the recording if he had known [defendant] was doing so," and "[p]resumably his employees would have done the same."  *Id.* at *4.  In addition, the court noted "the long history of recording" involving the plaintiff's employees.  *Id.*  The plaintiff failed to submit any evidence including any witness testimony indicating that plaintiff's employees objected to having their telephone calls recorded by the defendant.  *Id.*  Indeed, the plaintiff continued to place orders with defendant despite the notice of recording provided by the defendant.  *Id.*  Thus, the court found that the plaintiff had "consented to having its telephone calls recorded."  *Id.*

Here, in contrast, as mentioned above, the FAC does not make any allegations from which the Court can infer that Plaintiffs either expressly or implicitly consented to Defendant's unlawful conduct including, but not limited to, its recording.

### 3.     NRF's Reliance on Extrinsic Evidence Is Improper.

NRF makes an argument relying upon the purported "Privacy Policy" of Defendant, (NRF's Amicus Br. at 3:18-22), but inexplicably ignores that any such purported "Privacy Policy" has not been submitted into evidence by any of the parties (for good reason as extrinsic evidence is, of course, improper to consider on a Rule 12(b)(6) motion to dismiss unless such evidence can be considered via a request for judicial notice).  Here, it is beyond dispute that the Court could not take judicial notice of any such Privacy Policy. *See Gerritsen v. Warner Bros. Enter. Inc.*, 112 F. Supp. 3d 1011, 1030-31 (C.D. Cal. 2015) (Morrow, J.) ("the court declines to take judicial notice of information published on private websites") (citing cases).

## I.     The Court Should Disregard Defendant's Smear Attack.

Defendant's "Preliminary Statement" and "Background" portions of its Memorandum are replete with unprofessional personal attacks against Plaintiffs and their counsel.  (Def.'s Mem. at 2:20-28; 4:7-12; 4:17-22; 6:3.)

The Court should reject Defendant's smear campaign tactics intended to bias the Court. *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011) (Carter, J.) ("The Court is troubled that Defendants have devoted valuable pages in their Opposition to an apparent smear campaign ....").  Defendant's reference to other lawsuits filed by Plaintiffs and other clients of Plaintiffs' counsel is irrelevant to any issues pertinent to deciding the instant Motion. *Garcia v. Hanjin International Corp.*, 2021 WL 4260408, at *2 (C.D. Cal. June 16, 2021) (Gutierrez, J.) ("Plaintiff's litigation history is immaterial to this motion [to dismiss].."); *Portillo v. ICON Health & Fitness, Inc.*, 2019 WL 6840759, at *2 (C.D. Cal. Dec. 16, 2019) (Wright, J.).   Thus, the Court's consideration of Plaintiffs' litigation history (and the litigation history of other clients of

Plaintiffs' counsel's law firm) is improper for the Court to consider especially at the pleading stage.

## II.    CONCLUSION

Based upon the foregoing, it is respectfully requested that the Court deny Defendant's Motion in its entirety and grant such further and other relief as the Court deems appropriate.


Dated:  January 17, 2023                    PACIFIC TRIAL ATTORNEYS, P.C.

By: _/s/ Scott J. Ferrell_

Scott. J. Ferrell
Attorney for Plaintiff

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 13,944 words, which complies with the word limit of L.R. 11-6.1.

Dated:  January 17, 2023

_/s/ Scott J. Ferrell_
Scott J. Ferrell

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2023, I electronically filed the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

*/s/Scott J. Ferrell*
Scott J. Ferrell